We'll be turning to the next case, which is United States of America v. Fesler. I believe both of our counsel for that case are here in person. And it looks like they're both tied for the furthest distance of traveling from Anchorage, Alaska. That's right, Your Honor. I think, without sarcasm, we are enjoying warm and sunny Seattle. Go ahead and let us know. This must be Mr. Marks. Let us know how much time you plan to reserve for rebuttal and maybe state your full name for the record. Good morning, Your Honor. Michael Marks with the Federal Public Defender from the District of Alaska for Mr. Fesler. I will try to save two minutes for rebuttal if I can. This Court should reverse the denial of Mr. Fesler's suppression motion because the officers did not have reasonable suspicion that he was armed and dangerous. It's a little bit of a unique case. Armed is an easy question. Of course he was armed. The officers observed him handling a knife, and they told him to hold on to it and take care of it himself. I believe that was the words, take care of that yourself. Was he armed at the time of the pat-down? That is to say, there was a knife. When he was in the car, the officer says, would you put that, wrap up that knife and put it away. Was there yet another knife? There was a first knife that the officers saw on the dashboard and took away. That was early on in the encounter. The second knife they observed him handling in the car and told him to put it away. My understanding, and I think this was the magistrate judge's finding from the video, is that he took the knife and either wrapped it in his jacket or put it into the backpack that he was holding. And so just prior to the frisk, he had put the backpack on top of the car. So he certainly had access to it, had been handling it. I don't, it wasn't in his pocket. But at the time of the frisk, I'm not sure whether the officer had reason to believe he had yet, I guess, a third knife. Maybe he did, maybe he didn't. He certainly had no reason to believe that there was an additional knife. Maybe he did, maybe he didn't. Maybe he did, maybe he didn't. But I think if you look at the entirety of the stop, there are a number of factors that would suggest that whether or not, I mean, the real question is not whether he's armed at that point. The question is whether he's a danger. I mean, as Terry put it, whether a reasonably prudent man in the circumstances would be armed. The question is whether he might be armed. Well, does he pose a threat to their safety? I think that's the key in this case. And that's why the pat-down, to see if he is armed. Right. Well, to see if he's armed. But the question is, did they have a reasonable belief that he was a threat to their safety? And throughout the course of the interaction with Mr. Fessler, he's proving over and over, and the officers are acting as if he is not a threat to their safety. Well, your argument is that, as I understood it, is that they're letting him go at that point. So why do they need to pat down a guy who they're letting go? The only thing is, is they do want to get the keys from him. They're asking him for the keys. And he seems to be getting more frustrated by the fact, which is understandable, that they want the keys. And so that's the challenge for me, is that, and then he kind of is walking towards them, right? And so they've just observed him with a knife. So why is that not, you know, you've got a guy who's getting more agitated. They are planning to let him go, but they also need to get the keys from him and are hoping he'll give them the keys. And so then he's walking towards them, agitated, and they know that he's had some knives. Why is that not a reasonable suspicion to say, you know what, let's just make sure you don't have anything on you? Sure. I think, first of all, to say that they needed to get the keys from him, the government hasn't cited, and I'm not aware, Mr. Fessler said it himself. Okay, I don't think it matters so much that they need to get the keys, but I don't think it's like, I don't think they're breaking the law by asking him to give them the keys. No. And so they're asking for the keys. That's the interaction that's going on. They are planning to let him go, but it seems like you kind of ignore the fact that they're in this intermediate period where they're trying to get the keys from him. Well, no, I'm not ignoring that at all. The question is, you may have had a chance to watch the video, hopefully. To say that he's agitated, he's raised his voice a little, but he's still conversing with them. He actually, at the time that he's got the backpack on the top of the car, and he's still kind of talking with them, and he's using some swear words, but he's not using threatening language at all. He's not lunging at them. He's not being violent. And certainly maybe there's some more indication that he's upset, but as the magistrate just said, it's understandable he's about to lose his car. Or maybe somebody else's car. Or maybe somebody else's car. It was the car he was driving, or at least was sitting in. But I think the important thing is maybe that's the tip of the iceberg. Just because he has at that point become a little bit upset beyond what his demeanor was leading up to that point doesn't mean that we ignore the rest of the stop. They'd interacted with him for 25 minutes. Three officers knew him by first name. He hadn't said one threatening thing. He was conversing with them. They saw him handling knives, and, I mean, time after time, they see a knife, they take it away. They don't step out of the car. Maybe that's kind of a different deal to see somebody sitting in a car, you're outside the car handling knives, unless they're, like, really good at throwing them or something like that, I guess. But, like, versus now being outside the car, you're trying to get within presumably arm's length of that person to have them hand you the keys, and you're starting to get a little more upset. I don't know. It just seems like it's not unreasonable. Well, I think the important thing is it's an objective, reasonable test, but we're also deferring to what the officers did in the field. It's important to take into consideration their actions. Recall that the officers themselves, I think it was Officer Birch, was the one who created that very situation. He could have said, Mr. Fessler, I need you to step out of the car. We're going to impound the car, and I need you to leave the keys in. Please step out. Keep your hands up. He didn't do any of that. In fact, what he said is, grab your knife, put it in the backpack, then step out. So I understand. It's sort of the opposite of Valdez-Vega, where the court said, you know, there's a lot of innocuous stuff happening here, but we as the court are not going to step in and say that this officer in his training and experience said, it looked suspicious to me. I think the court should really defer to the same decision that the officer made here. It's in the other direction to say, there was no threat here. There was no problem going on. That's why he let him handle a knife and keep it. He was letting him go. And you can see the two officers look at each other. He says, I'm not giving you my keys while he's still sitting in the car. And they kind of look at each other. They don't say anything, but they're thinking, gosh, what are we going to do about this? And then he gets out of the car, and the other officer said, you're not going to give us the keys? He said, no, I don't have to give you the keys. And he's putting more stuff in the backpack, getting ready to go, and they look at each other again. And Officer Birch runs to the back. And you can just see kind of the gears turning. They say, how are we going to get these keys? And I understand that pretext isn't necessarily going to allow us to escape, but clearly I think what was happening is, that's how I'm going to get in is I'll frisk him. But you're thinking they were after the keys by frisking, not necessarily a weapon. There's no question in my mind that that's what was going on. That's possible. It's not how I viewed the interaction. But you say they'd interacted with him for a long time. That's true. But they had not interacted with him outside the car for a very long time. That is to say, between the time he gets out of the car, and he is upset, maybe not unduly given what's about to happen in terms of taking the car away, but between the time he gets out of the car and the time of the frisk, probably a minute, maybe less than that. It's pretty quick. It is. Well, again, the characterization is whether it's long or pretty quick. Well, we can go back and look and see how many seconds it is. Right. My sense is it was about a minute, maybe less. Right. But I think what's important is when he gets out of the car, he's responding to Officer Virch's order to get out of the car. He gets out of the car right next to the other officer who's sort of standing there watching him. That officer doesn't do anything. And they don't say as you get out. There's no command, you know, as you get out of the car, keep your hands clean and clear. They really don't take any steps to mitigate any danger to him whatsoever. I mean, it's pretty clear at that point. You can see them kind of giggling and laughing. And they said once that I've had the pleasure of arresting Mr. Fessler in the past. They're not scared of this person, and they're not scared of him being armed because they're letting him handle the knives that they saw him have. And, in fact, Virch sees the knife well before he gets out of the car and says to the other officer, hey, make sure he puts that away when he gets out. It wasn't, hey, that knife, Mr. Fessler, give that to me. I mean, he was letting him kind of, you know, reach around in the car and grab whatever he wanted. But thinking about that here, I mean, isn't that kind of a challenge for you a little bit? Because if they had wanted to, they could have, you know, I see them handling knives in the car. They could have said, they could have done a frisk just basically on that. They could have said, please put that knife on the dash and please step out of the car. So if they were really just fishing for, I mean, I hadn't thought much about the fishing for the keys. But if they're fishing for a weapon to get a felon in possession, they had a basis, a pretty legit basis to do that just as soon as they saw he was handling weapons in the car. Well, I think you might be right, and that's why the Thomas and the IEV cases are important. I know there's no weapons in those cases. But what they both talk about is the fact that once the officer has conducted the Terry investigation, the investigation is almost done, the point of the frisk has passed. Except for the being outside the car versus being inside the car, I think, is the distinction here, right? Now he's outside the car, and I think your position is, yeah, but they're letting him go. If that was true, if he literally stepped out and he's getting ready to walk off and says, oh, before you walk off, I want to do a Terry frisk, that would be a concern. But they're still interacting with him. I think that's what happened. I really, I think it's a distinction. But my point is, if that's what they were doing, then why wouldn't they have just, if they just wanted to find out if he had a firearm, why wouldn't they have just done a legit Terry frisk right away? Say, okay, you've got a knife. That gives us a basis to think you might have other weapons. So we'll just go ahead and. And had they done, I think this would be a different case if had they immediately, when they saw that first knife on the dashboard, said, hey, Mr. Fessler, we need you to get out of the car, and we're going to pat you down for weapons. We've seen a knife we need for officer safety. Had they come and testified to that, there was no eventual hearing. Do you think maybe that would have been okay? Maybe it's a better case for the government. But the fact is, once this investigation is basically over and he's saying, you know, I'm not giving you the keys, there's really no more reason to detain him, and so no more reason to engage in the Terry frisk because the Terry stop is at that point effectively over. Well, we've taken you over, but I'll make sure. Can I ask, can I? Sure. Sorry to hold you over time, Mr. Marks. You had briefed an argument that you thought the level of the crime that Mr. Fessler was suspected of would play a role in the officer's decision. I think essentially your argument was he's simply suspected of trespassing, shoplifting, invalid vehicle registration. And I can't remember what you said. You said either that's dispositive or it should play a factor in the analysis that there was no reasonable suspicion. And I don't think that's right. Can you address that, please? So, sure. There are a number of cases in this court that talk about if a person is suspected of something that's a violent crime, a burglary, a nighttime burglary, or even certain narcotics offenses, there's a presumption that the person might be armed. And that itself, the fact that you've encountered somebody that's suspected of that kind of crime and you believe they're the person who did it might give you cause. Right, but I don't think you could draw an inference from that because I think that under Terry versus under the Terry test, I think the question is whether the person poses a risk to the officers or to the public. And sure, somebody who is suspected of these things and is observed with knives, I think that they could pose a risk. I don't disagree with that. I'm not suggesting that the fact that you're not accused of a violent crime is dispositive. All I'm saying is that one factor that the court should consider in deciding whether there was a reasonable fear for their safety is the fact that this wasn't a particularly egregious offense. You're just saying, considering all the circumstances, stealing donuts is different from armed robbery. Exactly. Okay, thank you. Thank you. Counsel, we'll hear from the government. Could they have arrested him for the donut offense? I mean, it seemed like pretty strong evidence that he had actually stole the donuts. Is that like a non-arrestable offense? I personally think they could have arrested him. So if they could, I mean, that's another thing that just seems to me like if they just wanted to find out if this guy had a gun, why not just arrest him for the donut offense and then pat him down and find out if he has a gun? It just seems to me there's a lot of evidence here that they weren't actually doing a pretextual frisk. And that's our argument both in our briefing and again here this morning. May it please the Court, Stephen Corso of the United States, Your Honor. Our view is that the court should uphold the denial of the motion to suppress and uphold the conviction of Mr. Fessler for possessing a firearm as a felon. And as we know, reasonableness is the key inquiry in any Fourth Amendment analysis. And the officers here were, in our view, quite reasonable in being warranted in an objective standard in believing that their safety was at issue when Mr. Fessler had stepped out of the car. This is a close case for me because he is cooperative throughout the time he's in the car. When he gets out of the car, he's cursing, but he seems pretty more or less under control. They don't frisk him immediately when he gets out of the car. They frisk him or Officer Birch frisks him only when he has walked to the back of the car and looks as though he's about to walk away. So this one really doesn't look as though they're all that concerned. I think Birch is kind of at the spur of the moment, decides, hey, I'm going to frisk this guy. And I don't quite know what they know about him from prior acquaintances, but, I mean, they know this guy. They do know him. And what do we know about those prior encounters? Do we know anything that would either give them more or less suspicion? Do we know anything about the prior encounters? They're out in what we call the Matsu Valley outside of the city of Anchorage in the city of Wasilla. They do know Mr. Fessler. And typically in these situations, the officers who are well-acquainted with people like Mr. Fessler are well-acquainted because they're low-level criminals who consistently have encounters with police officers and so forth. Do we know anything specifically about the prior encounters? We do know that there have been. I get that. Do we know that either gives them more suspicion or less? Do we know the nature of the prior encounters? They're in the record in the district court. I'm not convinced they're in the record before this court. But they're a series of low-level domestic violence, drug, alcohol. The constant interaction is indicative of drug addiction and substance abuse and the things that go along with that in society and the people who experience those types of issues. They have a lot of contact with law enforcement. Because it's repetitive, we can conclude that he hasn't served lengthy prison sentences, probably kind of in and out of jail quite a bit. But someone who's just constantly in the thorn of the police officers out in the Montessu Valley and in Basilan in particular. Yeah. But as I look at that video, it doesn't appear to me that even as he goes getting out of the car that they thought that they needed to frisk him because he got out of the car. He was out of the car for quite a while. He's walked to the back of the car. And only when he's at the back of the car, it looks as though he's about to walk away, does Officer Birch stop him and frisk him. We have a slightly different view. He did get out of the car. And for us, that's extremely important here. I think when they had him in the driver's seat, they could manage him. But once he gets out of the car, he has more motion, more freedom of motion and range. Of course he does. Sure. And he's more of a threat. So right away he gets out of the car. So instantly he's more of a threat to the officers. I don't think he was out of the car that long, though. You were debating that a little bit in the first part of the argument. But 30 seconds, maybe 60 seconds. Yeah, that's about right. He stepped out of the car. He was fumbling toward his shins or knees. Maybe there was a backpack on the ground. It was hard for me to tell. But then he walks immediately to the back of the car where Officer Birch is. Officer Birch is at the open trunk, obviously at the back of the car. And as soon as Mr. Fresler walks toward Mr. Birch, my recollection is Birch takes a step backward and then collects himself and decides to do the frisk at that point. We believe that frisk was reasonable given the fact that Fresler, by that point, had handled three knives in just the 20 minutes or so. I got the two. How did we get to three? We agree on the two. The third is the third officer to arrive standing in a tactical position where he can keep a very close eye on Mr. Fresler, but not so close that Mr. Fresler can make a quick move toward him, observed what he called some sort of a blade. That, in our view, is the third knife. In our view, Mr. Fresler had the first knife, which Birch reached through the open window of the car and took from him. Then Fresler had two more knives, the knife and the blade, and then was told to wrap those up in some sort of a jacket or something and put those in a backpack. Was the third knife then, in your view, put in the backpack? It's hard to tell. It's a little bit hard to tell, but we assume it was. The officers gave no indication that it wasn't. So it looks as though, whether there are two or three, all the knives that have been observed have been put away. There may be others that have not been observed. Yes, and that's the key point. The knives that the officers detected were put away. At least we can conclude that reasonably. There was a fourth knife, too, on the front passenger, Anguson. He was frisked within the first couple minutes of the stop. He's the guy eating the donut, right? Correct. And we think that's important, too. So regardless of this issue involving the key to the car and the impound of the car, Birch frisked Anguson for weapons within a couple minutes of starting the encounter. And during that, I guess just ahead of that frisk, Anguson said he did have a knife, and Officer Birch told him that he's the one who's standing out. He was standing outside the car or he was in the car? He was standing outside the car between the front passenger door and the body of the car eating a donut. So long before the key or getting access to the key or impounding the car was an issue, Officer Birch felt it appropriate to frisk Anguson for weapons, and Anguson admitted to having a knife. And we think that's an important fact to keep in mind when evaluating the reasonableness of the search of Fesler and whether that was just a pretext to harass Fesler or go after the keys to the car. We think another point to keep in mind is these officers took tactical positions this entire time. There's a notion in the briefing from Mr. Fesler that they all knew each other, they didn't perceive Fesler as a threat, and we disagree with that. From the very moment that Birch showed up and engaged with Fesler and Anguson, he took a tactical position. He, I think, very intentionally stood on the opposite side of the open front passenger door, moved around the open door to frisk Anguson, and then these officers, as they arrived, they kept a very close eye on both Fesler and Anguson. Birch, when he was there by himself, kept both Anguson and Fesler in his line of sight based on where he stood. The second officer to arrive took a tactical position outside the front driver's door where he could keep a very close eye on Mr. Fesler. In fact, when that second officer arrived, Birch instructed the second officer to keep an eye on Fesler, and they did. As Fesler moved, they watched him. As Anguson moved, there was a couple points where Anguson reached through the open passenger door into the car, and the officers right away told him not to do that. When Birch walked from the Mercedes to his cruiser, he instructed Anguson to not move, to stand still. Anguson, I think, instinctively kept his hands on top of the car most of the time, signaling to Birch that here are my hands, you're watching my hands, they're on top of the car. And on the occasions where he lowered his hands into the car, the officers, boom, they picked up on it right away and told him to get his hands outside of the car. So they were conscious of their security throughout the encounter, and the pivotal moment for us is Birch, is Fesler getting out of the car and then walking toward Birch, who was in the back of the car. He didn't wheel away and walk away. He walked right toward Birch, and by that time he had handled what we believe is three knives. Anguson had had a knife, and they were reasonable in frisking Fesler under those circumstances. Under this objective test, we believe that a reasonable officer would feel warranted in feeling threatened by the close proximity of Fesler to the officer and the presence of three knives in the car, including possibly a fourth on Anguson. That's really our position. If there aren't any further questions, then we'll yield the rest of our time to the court. It looks like we have any. Thank you to the government. We'll put two minutes on for rebuttal for Mr. Marks. Mr. Marks, there at the end he talked about the fact that it's not quite true that, yes, the officers were calm and it didn't seem to be a highly agitated interaction, but they were being careful. Don't we have to worry a little bit about if we were to have some sort of rule, and I think you had mentioned that they weren't worried about these guys, but the officers have a good reason to be kind of calm and try to keep the temperature down, so to speak. So we don't want to punish officers for acting that way, do we, by having some sort of rule that if the officers aren't visibly agitated, then we would apply a different standard than if they were. No, I don't think that's the case. But I think it's just like we were talking about with the offense. There's a number of different factors that you have to evaluate under the totality of the circumstances. And I think, unfortunately, we don't have any declaration or testimony from the officers, so we have to kind of look at the video and infer. And I think from looking at the interaction, not just the fact that they used calm voices, but that they were laughing, cutting jokes, they kind of entertained some sort of ridiculous questions from the passenger and Mr. Fessler, indicate that it wasn't really a strategic effort to calm down a very tense situation, but was, in fact, not a tense situation. I'm asking the court to draw that inference. I want to just briefly mention Anguson. I don't want to get too lost in the sidetrack, but if you listen to what Birch says, he says, you've been accused of stealing a wallet and a cell phone. I'm going to patch you down for knives and a wallet. And it's funny that he says wallet. He's looking for the wallet. He's not looking for knives. Now, Anguson says, I've got a knife. Birch is so uninterested by that that he says, okay, hang on to it and keep your hands up. So he's not looking for knives. That wasn't his concern. He was looking for the wallet. That was a, I think, unconstitutional search. I don't represent Mr. Anguson. I don't know what happened to him. But, again, I think, suspect that maybe the motivation was to get the keys, and there's some reflection in that in Birch's conduct earlier. He also, when he took the backpack from Anguson, the passenger, he said, can I search it? And Anguson first said yes, and then he said no. He said, you don't want me to search it? He said no. And then he said, I'm just going to seize it. And he took it and he put it in the car. So it doesn't necessarily mean that one constitutional violation led to the other, but we're getting a picture here, if you look at the interaction between these officers and these people who they were familiar with, probably had had plenty of encounters with, that this was not actually a search, either objectively or subjectively, that was motivated by. He searched Anderson looking for stolen property, and he's searching your client because looking for stolen donuts? I mean, what are we. . . I think he's looking for the keys. The keys. They seem frustrated that he's not going to give them the keys of the car, and you can imagine when a car gets impounded, if you don't have the keys, it causes a problem for the tow driver. It's more difficult to get rid of at auction, and I think also they were just frustrated with Mr. Fessler at that point, honestly. And it just sounds like that when you listen to their voices. And, you know, perhaps there was a concern, you know, maybe he's got some drugs on him or something else. I don't know. Again, we don't have testimony, so it's hard to say, but that's. . . Could they have arrested him for the donut violation? There's a. . . We can test it below whether or not he actually, the person from the store pointed at him or the person in the back seat. Let's assume. . . Let's assume that. . . Well, the guy comes out of the store and points at Fessler and said, you stole the donuts. There's a guy in the back seat, and it's unclear. But let's say he. . . For the sake of argument, yeah, he pointed at him. He's the one who stole the donut. And, yes, they can arrest him for shoplifting. I don't think there's any. . . I'm not aware of it being too petty of an offense or something like that. But certainly the exception for a search incident to arrest only. . . So your point would be they weren't interested in arresting him until they wanted to get the keys. That's your theory. I don't think they were interested in arresting him at all. I think they wanted him to go. They weren't interested in even frisking him until the keys. Yeah, we hear your theory. All right, well, do my colleagues have any other questions? Thank you. Well, thank you to both counsel again for your helpful argument this morning. This case is submitted as of today.
judges: FLETCHER, VANDYKE, Liburdi